IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 29, 2008 Session

**STATE OF TENNESSEE v. COREY DEAUNTAE TARVIN,
alias COREY DEANTE TARVIN, alias COREY DEAUNTAE BROWN**

**Direct Appeal from the Criminal Court for Hamilton County
No. 255684     Barry A. Steelman, Judge**

---

**No. E2007-01927-CCA-R3-CD - Filed February 6, 2009**

---

The defendant appeals as of right from his Hamilton County jury conviction for first degree premeditated murder, for which he received a life sentence.  He contends that the trial court erred by admitting unduly prejudicial autopsy photographs of the victim and that the evidence was insufficient to show that he premeditated the killing.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, Corey Deauntae Tarvin, alias Corey Deante Tarvin, alias Corey Deauntae Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William H. Cox, District Attorney General; and Jason Thomas and Charles Minor, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the shooting death of Jerry Garth, which occurred at the hands of the defendant on a residential Chattanooga street in the early morning hours of June 15, 2005.  At the defendant's May 22-25, 2007, trial, Officer Matthew Talley of the East Ridge Police Department testified that on June 15, 2005, he was employed with the Chattanooga Police Department and working the third shift in the Highland Park area.  He said that at 12:07 a.m., he received a call that there was an apparent gunshot victim lying in the middle of the street in the 600 block of North Holly.  He stated that when he and his fellow officers responded to that location, they saw a large crowd in the middle of the street and the victim lying in the street partially on his side with his face down.  He testified that, according to the report he had prepared, witnesses at the scene reported that an unknown suspect had fled the area in a blue Blazer.  On cross-examination, he acknowledged that

his report indicated that witnesses also stated that the victim and the defendant had been arguing before the shooting.

Detective Gregory Mardis of the Chattanooga Police Department testified that he was an investigator with the crime scene unit and responded to the scene of the shooting at 1:19 a.m. on June 15, 2005. He stated that when he arrived, another investigator related that the defendant and the victim had gotten into an argument, that a fight had ensued, and that the defendant had retrieved a gun from his vehicle, shot the victim, and fled the scene. Detective Mardis identified a number of items that were subsequently admitted into evidence, including crime scene photographs that showed where the victim's blood had "puddled up on the street[.]" He stated that he searched the area but was unable to locate any weapon.

Lottie Stamper, who said she lived at 609 North Holly Street and had known the defendant for years, testified that on the night of the shooting, the defendant and a number of other individuals were "hanging out" in the vicinity of Larry Harper's duplex located at 618 North Holly. She said that another neighborhood resident known as Greg or "Fat Boy" spoke to the defendant's girlfriend and that the defendant became angry, telling him that he could not be "hollering at [his] bitch like that." She stated that the two men exchanged words and then began fighting. She testified that two other men, Ladarius and Cornelius, became involved and that the victim, who was visiting his aunt at 614 North Holly, walked down the street to attempt to break up the fight. She said the victim was unsuccessful, walked back to his aunt's house, and went inside. She testified that the victim then came out of his aunt's house and walked to his car, talking about his "Game Boy." She stated that the defendant and the other men were no longer fighting at that time but were still down the street at Harper's house arguing.

Stamper described the shooting:

> [The victim] went in the car, he was bent over in the car. As he came out [of] the car, we was sitting on the corner. By that time, [the defendant] came out of [Harper's] house and somebody said "Gun!" Everybody . . . left the street so fast, and . . . me and one of my neighbors . . . said at the same time, "Somebody going to get shot." By that time, [the victim] had, you know, one knee in the car. . . . And he's coming out. As he turned, [the defendant] was coming up the street with the gun, fired the shot, [the victim] fell, everybody had scattered.

Stamper further testified as follows. She went to the victim and began applying pressure to his wound. As she did so, he kept asking what he had done and why had he been shot. She was still with the victim when the defendant drove down the street toward them in a sports utility vehicle, and she overheard him say, "I'm going to run over that motherf-----." She put herself in front of the victim and told the defendant not to do it. He paused a minute, said, "I should have ran over that motherf-----," and then drove off.

Stamper testified that she did not tell the police that the victim was involved in the argument or the fight and suggested that either the police officer who took her statement misunderstood her or that she misspoke and said the victim's name when she meant to say Greg. She stated that she saw the defendant go to his vehicle at some point between the fight and the shooting but that she did not see him retrieve a gun from the vehicle. She said the defendant was the only one she saw with a gun that night. Finally, she testified that although the defendant had grown up with her children and been "just like a son," she felt obligated to testify against him because she had witnessed him kill the victim.

On cross-examination, defense counsel played a portion of Stamper's tape-recorded statement to police, made within a few hours of the shooting. Stamper acknowledged that she said in the statement that the victim and the defendant were arguing over a girl and got into a fight and that the victim's cousins attempted to break up the fight. She further acknowledged that she never said anything in her statement about the victim's having gone to retrieve something from his car, instead telling the police officer that the victim was walking away from the fight when he was shot. She explained the discrepancies by stating that she might have said anything in the immediate hours after the shooting and insisted that the account she provided on direct examination was accurate. She testified, "Like I said, when the boy got shot, I could have said anything. I don't know. I hear what's on there and I understand what's on there, but I'm telling you what happened, the way it happened."

The victim's cousin, Antoin Edwards, testified that he was twelve years old at the time of the shooting and that he had been playing video games that night with the victim at his aunt's house, where two other cousins, Ladarius and Cornelius, were present. He said that he heard voices outside and that the victim and Cornelius left the house. He stated that the voices got louder and that he looked out the window and saw the defendant shoot the victim in the back. He estimated that the men were within a foot of each other when the shot was fired and said that he did not see anything that preceded the shooting.

Homicide Detective James Tate of the Chattanooga Police Department testified that the defendant was arrested at approximately 11:00 a.m. on June 16, 2005, and brought to the "service center" where he and Detective Miller questioned him about the crime. He identified the defendant's waiver of rights form and his tape-recorded statement, which were subsequently admitted into evidence. In the statement, played for the jury, the defendant said that he and Gregory Scott got into a fight after Scott "disrespected" the defendant's girlfriend. He said that after three or four minutes of one-on-one fighting, two to four other men jumped in, ganged up on him, and tore off his shirt. The defendant stated that he told the men the fight was over and that they broke loose, letting him go. He said that he was walking away when he noticed a second group of people headed down the street toward him. He stated that he "made up [his] mind," went to the porch of a duplex, retrieved a hidden gun, turned around, and fired at the victim, who had been following him and who turned and began to run away when he saw that the defendant had a gun. The defendant stated that he had to "rack" the gun in order to fire the shot. He said that he intended to commit an aggravated assault on the victim and did not mean to kill him.

-3-

Detective Tate testified that the gun came from the porch of 618 North Holly Street, which was more than twenty yards from where the victim's body was found. He said the defendant had no visible cuts or abrasions on his face or hands during the interview and did not appear to have been in a recent fight. He testified that the defendant never identified the victim as one of the major participants in the altercation. On cross-examination, he acknowledged that the shirt identified as the one the defendant had been wearing on the night of the altercation was torn.

Frank King, Jr., M.D., the Hamilton County medical examiner who performed the autopsy of the victim's body, testified that the cause of death was a gunshot wound in which the bullet entered the victim's body at the left lower back, grazed against the spine, tore the aorta, went through the bowel, and exited at the right anterior abdomen. He classified it as a distant gunshot wound, fired from a distance of two feet or greater, and he said that it entered the body at 45.5 inches above the heel and exited at 44.5 inches above the heel, which meant that it descended one inch from point of entry to point of exit with the body in "anatomic position." He stated that he observed no fresh injuries to the victim's head, hands, or legs other than those caused by the emergency medical care he received after the gunshot. He testified that he found two fresh abrasions on the back right shoulder, which could be consistent with the victim's having fallen to the pavement after being shot. During his testimony, Dr. King identified several autopsy photographs, which were admitted into evidence and published to the jury. On cross-examination, he acknowledged that the victim's hands had been washed in the emergency room and that he had no way of knowing the exact position of the victim's body, head, or limbs at the time he was shot other than that his lower left back was facing the direction of fire.

The defendant elected not to testify and presented no witnesses in his defense. After deliberating, the jury convicted him of first degree premeditated murder, and the trial court sentenced him to life imprisonment. Thereafter, the defendant filed a timely notice of appeal to this court.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction. He argues that insufficient proof existed to support a finding that he premeditated the killing. The State argues that the evidence is sufficient to show premeditation. We agree with the State.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree premeditated murder is defined as the unlawful, "premeditated and intentional killing of another." T.C.A. §§ 39-13-201, -202(a)(1). "Premeditation" is defined as

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has noted the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

We conclude that the evidence, viewed in the light most favorable to the State, was sufficient to sustain the defendant's conviction for first degree premeditated murder. According to Lottie Stamper's testimony, the victim's only involvement in the fight was his attempt to break it up. Moreover, she said that the defendant and the other men had stopped their physical fight at the time the defendant retrieved the gun and shot the victim in the back. The defendant admitted as much in his statement to police, acknowledging that the fight was over and that the victim was not hitting or touching him at the time he shot him. The defendant also admitted that the victim was moving away from him at the time. It was undisputed that the victim was unarmed, that he was shot in the back, and that the defendant fled the scene after the shooting. From this evidence, a rational jury could have reasonably concluded that the defendant premeditated the killing.

## II. AUTOPSY PHOTOGRAPHS

The defendant contends that the trial court erred in admitting autopsy photographs that were unduly prejudicial and cumulative in nature. He argues that because the cause of death and the fact that the victim was shot in the back were never disputed, the autopsy photographs had no probative value but merely served to inflame the passions and prejudices of the jury. The State argues that the trial court did not abuse its discretion in admitting the photographs, which served to aid Dr. King's testimony. We agree with the State.

The admissibility of photographs is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. State v. Porterfield, 746 S.W.2d 441, 450 (Tenn. 1988). The leading case regarding the admissibility of photographs is State v. Banks, 564 S.W.2d 947 (Tenn. 1978), in which our supreme court held that the admissibility of photographs of murder victims is within the discretion of the trial court after considering the relevance, probative value, and potential unfair prejudicial effect of such evidence. Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-51. The probative value of the evidence must be weighed against any unfair prejudice the defendant will

suffer in admitting the evidence, and only if the unfair prejudice substantially outweighs the probative value may the evidence be excluded. Id. at 951.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The court must still determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. Id. The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Banks, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Notes).

In Banks, the supreme court gave trial courts guidance for determining the admissibility of relevant photographic evidence. A trial court should consider: the accuracy and clarity of the photograph and its value as evidence, whether the photograph depicts the body as it was found, the adequacy of testimonial evidence in relating the facts to the jury, and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. Id.

In this case, the trial court took care in a jury-out hearing to examine the State's proposed photographs in turn to determine if each was relevant to an issue at hand and if its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The court denied the State's request to admit certain photographs on the basis that they were cumulative, and it ordered that others be cropped to remove views of the victim's face and the stitches in his chest and abdomen that resulted from the emergency medical procedures employed in an attempt to save his life. The trial court eventually admitted a photograph showing the entrance wound on the victim's back, three photographs of his hands, and a photograph of his legs. Of these, the only one that is potentially disturbing is the photograph of the entrance wound, which shows the victim's back and buttocks rolled sideways on the autopsy table with some blood beneath him. At the jury-out hearing, the State argued that the photograph was relevant to give the jury a perspective on where the bullet had entered the victim's body, which was important to the State's attempt to prove the elements of premeditation and intent. The trial court agreed, ruling that the evidence was relevant and that its prejudicial effect did not substantially outweigh its probative value:

> But, for purposes of showing the jury the entrance wound in the perspective of the body as a whole, I think it is necessary to show this photograph, even that shows the victim's buttocks, and even shows some of . . . this blood on the autopsy table.
>
> . . . .

There is some blood in the photograph, but again, the victim's head is not shown. It's just his back and his buttocks. And the jury, I think, juries I think are more sophisticated in this day and age. I think they are exposed to much more in television . . . I just don't find that it's so graphic that it would be prejudicial to the extent, under rule 403, that the probative value would be substantially outweighed by the danger of unfair prejudice.

We conclude that the trial court acted within its discretion in admitting the photographs. Because the defense attempted to show that the victim participated in the fight, photographs of the victim's hands and legs were relevant to show that he had no physical signs of a recent altercation, while the photograph of the entrance wound in his back was relevant to the State's attempts to show that the defendant premeditated the killing. None of the photographs, including the one showing the blood on the autopsy table, was unduly gruesome or disturbing. We conclude the trial court did not err in its admission of the autopsy photographs.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the defendant's conviction for first degree premeditated murder.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE